1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CAROLINA CASUALTY INSURANCE              CASE NO. CV F 08-0691 LJO SMS
     COMPANY,
12                                            **ORDER ON CROSS MOTIONS FOR**
                          Plaintiff,          **SUMMARY JUDGMENT ON THE ISSUE**
13          vs.                               **OF INSURANCE COVERAGE**

14   ELIZABETH S. ORTIZ, et al,

15                          Defendants.
     _____/
16
     and related counter-claims
17   _____/

18       The parties have filed cross motions for summary judgment pursuant to Fed.R.Civ. P 56.

19   Plaintiff and Counterclaim defendant Carolina Casualty Insurance Company ("Carolina Casualty" or

20   "plaintiff") moves for summary judgment, or in the alternative, summary adjudication, on its claims that

21   it has no duty to indemnify and defend the Counterclaimants' claims. Defendants and Counterclaimants

22   move for summary judgment on the issue of insurance coverage.

23                            **FACTUAL BACKGROUND**

24       Plaintiff Carolina Casualty issued an insurance policy number CTP 3398 30 ("Policy") to

25   Antonini Freight Express, Inc., Antonini Brothers, Inc. dba Antonini Fruit Express, Antonini Enterprises,

26   LLC (collectively "Antonini"). This case involves whether Antonini's Policy provided coverage to

27   A&A Transport Company, Inc. as an "Additional Insured" for a motor vehicle accident on August 10,

28   2005.

                                        1

**A.      The Hauling Agreement**

For the 2005 tomato harvest season, Stanislaus Food Products Co., Inc. ("Stanislaus Food") hired two trucking firms to transport tomatoes from fields throughout the central valley to Stanislaus Food's processing plant in Modesto:  Antonini and A&A Transport Company, Inc. ("A&A Transport").  A&A Transport and Antonini were the sole transporters of tomatoes from the fields to Stanislaus Foods' processing plant.

On April 8, 2005, Antonini entered into the Hauling Agreement ("Hauling Agreement") with Stanislaus Food.  (Doc. 8, First Amended Complaint ¶12; see also Doc. 113, Hauling Agreement.) Stanislaus Food entered into a separate Hauling Agreement with A&A Transport, which generally mirrored the Hauling Agreement with Antonini. (Doc. 115, A&A Transport Hauling Agreement.) The Hauling Agreement which Antonini executed stated that Antonini is the "CONTRACTOR" and defendant A&A Transport as the "other designated hauler." (Doc. 136, Undisputed Fact no. 38.) Stanislaus Food was called "COMPANY" in the Hauling Agreement.  Antonini's insurance obligations towards A&A Transport are set forth in Paragraph 9 of the Hauling Agreement which provides, in part, as follows:

> "It is understood COMPANY'S tomato hauling needs are to be provided by two tomato haulers.  CONTRACTOR must agree to provide trailer interchange insurance with the other designated hauler in a form and proof acceptable to COMPANY. CONTRACTOR agrees to name the other designated hauler as an additional named insured on their general liability and motor cargo insurance policy." [Doc. 113, Hauling Agreement, ¶9.]

Thus, pursuant to their respective Hauling Agreements, Antonini and A&A Transport were each to name the other hauler as an additional insured on certain policies of insurance and provide proof of the insurance to Stanislaus Food. (Doc. 113, Hauling Agreement ¶9.)

**B.      The Underlying Action**

The underlying action arose from a motor vehicle accident on August 10, 2005 involving an A&A Transport driver.  Jose Pimentel Rodriguez was a truck driver for A&A Transport Company and was driving an A&A Transport tractor-trailer combination. He was hauling two trailers full of tomatoes from the field to Stanislaus Food's processing plant in Modesto, California.  The tractor-trailer drifted across the center line, clipped a tractor-trailer operated by Victor Newball, then struck a pick-up truck

2

1   operated by Fred Carlotti, and finally struck a van occupied by five men, killing the five men.

2       An underlying wrongful death action was filed by the Ortiz defendants[1] and the Diego

3   defendants[2] against A&A Transport and Jose Pimentel Rodriguez.  A&A Transport and Jose Pimentel

4   Rodriguez tendered the underlying action to their insurance carriers, all of whom settled except Carolina

5   Casualty.  A&A Transport assigned to the Ortiz defendants and the Diego defendants all of A&A

6   Transport's rights, actions and causes of action against Carolina Casualty, its agents, brokers, subsidiary,

7   and all other person for breach of insurance contract and/or refusal to defend or indemnify A&A

8   Transport.  (Doc. 22, Counterclaim ¶20.) It is undisputed that the accident involved a tractor owned by

9   A&A, operated by an employee of A&A, and pulling trailers owned by A&A with tubs owned by

10  Stanislaus and leased to A&A. It is undisputed that Antonini was not involved in the underlying accident

11  and did not involve any equipment owned or operated by Antonini.

12      Carolina Casualty filed this action for a declaration of its rights and duties under the Policy as

13  against the Ortiz defendants, the Diego defendants, A&A Transport and Jose Pimental Rodriguez.  The

14  Ortiz defendants and Diego defendants filed counterclaims against Carolina Casualty.  A&A Transport

15  and Jose Pimental Rodriguez defaulted in this action.[3]

16  _____

17      [1] Defendants and counterclaimants are ELIZABETH S. ORTIZ, individually and as Guardian ad Litem for
18  KASSANDRA N. ORTIZ and ALEXIS J. ORTIZ, minors; KASSANDRA N. ORTIZ and ALEXIS J. ORTIZ, each
    individually; ESTATE OF JAVIER ORTIZ FUENTES, by and through its Representative ELIZABETH S. ORTIZ
19  (collectively, the "Ortiz Defendants").

20      [2] Defendants and Counterclaimants are VERONICA DIEGO, individually and as Guardian ad Litem for JOSÉ
    ANTONIO DIEGO and ROBERTO DIEGO-JERONIMO, minors, each individually and as Successors in Interest of Aniceto
    Diego Trujillo, deceased; MARIA GUADALUPE ALFARO VEGA, individually and as Guardian ad Litem for KARINA
21  ALEJANDRA CORTES ALFARO and LUIS GERARDO CORTES ALFARO, minors, each individually and as Successors
    in Interest of Gerardo Cortes Cervantes, a.k.a. Gerardo Cortez, deceased; MARIA IMELDA MERCADO individually and
22  as Guardian ad Litem for VICKY NAVA, JOESELYN NAVA and STEPHANIE NAVA, minors; VICKY NAVA,
    JOESELYN NAVA and STEPHANIE NAVA, each individually and as Successors in Interest of Gabino Nava Sanchez a.k.a.
23  Omar Ramirez, deceased; FAVIOLA QUEZADAS DE VELASQUEZ, individually and as Guardian ad Litem for LAURA
    ALEJANDRA VELASQUEZ QUEZADAS, ALONDRA LIZBETH VELASQUEZ QUEZADAS, JOSÉ DE JESUS
24  VELASQUEZ QUEZADA, JOHN VELASQUEZ-QUEZADA, RICHARD VELASQUEZ-QUEZADA and DIEGO
    EMMANUEL VELASQUEZ-QUEZADA, minors, each individually and as Successors in Interest of José Velasquez
25  Martinez, deceased, the moving parties herein (collectively, the "Diego Defendants").

26      [3] Plaintiff argues that its motion for summary judgment should be granted because A&A Transport has admitted the
    allegations in the complaint by its default in this action.  On July 30, 2008, plaintiff and A&A and Rodriguez entered into
27  a stipulation for default.  (Doc. 20.)  The Court entered default on July 31, 2008.  (Doc. 21.)  "Upon default, the factual
    allegations of the complaint, except those relating to the amount of damages will be taken as true." *Geddes v. United Fin.*
28  *Group*, 559 F.2d 557, 556 (9th Cir. 1977).  Plaintiff argues that with the default, A&A and its employee Rodriguez are

**C.     The Blanket Endorsement**

Antonini obtained the insurance required under the Hauling Agreement.  The Policy with Carolina Casualty included coverage for general liability, motor cargo, trailer interchange, and commercial automobile liability.  (Doc. 8, First Amended Complaint ¶17.)  The effective date of the policy was from October 1, 2004 to October 1, 2005.

Antonini's Policy contained a blanket endorsement that modifies four types of coverages under the policy:

> "This endorsement modifies insurance provided under the following:
> COMMERCIAL AUTOMOBILE COVERAGE
> COMMERCIAL GENERAL LIABILITY
> BASIC CARGO COVERAGE
> CARGO LIABILITY COVERAGE" (Doc. 109, Policy, Bates 100008.)

The Blanket Additional Insured Endorsement amends who is "insured" to include those persons required by a written contract to be covered as an additional insured.  The Blanket Additional Insured Endorsement provides coverage for "additional insured":

> A.     WHO IS AN INSURED (Section II - Liability Coverage) is amended to include as an insured any person or organization (called additional insured) with respect to the operation, maintenance, or use of a covered "auto" **whom you are required to add as an additional insured on the policy under a written contract** or agreement evidenced by certificate of insurance on file with "us" . . . (Doc. 109, Policy Bates 10008) (emphasis added.)

Thus, the Blanket Additional Insured Endorsement provided coverage for persons Antonini was require to add as an additional insured under a written contract.

**D.     Certificate of Insurance**

Antonini's Insurance agent, Seitz Perkins Insurance, executed a Certificate of Insurance on July 29, 2005, identifying A&A Transport as an additional insured on Carolina Casualty's policy number

---

deemed to have admitted that (1) Antonini's insurance objections toward A&A are only to provide trailer interchange coverage, (2) name A&A as an additional insure for general liability and motor cargo insurance only, and (3) that Carolina Casualty had no duty to indemnify or make payments.  Here, however, A&A Transport's claims against Carolina Casualty have been assigned to the Ortiz Defendants and Diego Defendants, and while not specifically stated by the parties, the assignment of rights occurred before A&A Transport's default.  (See Doc.135, Ortiz Opposition p.4.)  Thus, it appears the rights had already been assigned before any default.  While the argument does not appear to have merit, the Court does not reach plaintiff's "default" argument because the Court reaches the merits of the coverage issue.

CTP 3398 30.[4] (Doc. 114, Certificate of Insurance.)  The Certificate of Insurance was issued to "Insured"

Antonini Freight Express and purports to list "A&A Transport Company" as the Certificate Holder for

four types of insurance: (1) general liability, (2) automobile liability, (3) physical damage, and (4) cargo.

(Doc. 114, Certificate of Insurance.)  Each "box" next to each of these 4 types of insurance is checked

on the Certificate.  (See Doc. 114, Certificate of Insurance.)  The top portion of the Certificate of

Insurance states, in all capital letters:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION
> ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE
> HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND, OR
> ALTER THE COVERAGES AFFORDED BY THE POLICIES
> BELOW." (Doc. 114, Certificate of Insurance).

The parties dispute which "coverage" applied to A&A Transport in the "Policy."

**E.      The Claims in the Current Action**

The issue in the current action is whether Policy issued by Carolina Casualty to Antonini covers

A&A Transport as an "Additional Insured" for the accident.

Carolina Casualty filed this declaratory relief action alleging the following claims:

1.      Declaratory Relief,

2.      Reformation.  (Doc. 8, First Amended Complaint).

The Diego Defendants and the Ortiz defendants answered and filed counterclaims asserting the

following:

1.      Declaratory Relief,

2.      Breach of Contract,

3.      Breach of the Implied Covenant of Good Faith and Fair Dealing, and

4.      Negligent Misrepresentation. (Doc. 22 (Ortiz Defendants) and Doc. 23 (Diego
        Defendants).

This Order addresses the "coverage" issue, and thereby, any claims which are dependent upon the issue

of insurance coverage.

---

[4] Bernard Seitz was Antonini's agent and also authorized to sign the Certificate of Insurance as "Crouse and Assoc." Crouse and Assoc. is a managing general agent for Carolina Casualty with authority to do business on Carolina's behalf. (Doc. 137, Carolina's Response to Def's Undisputed Facts  Fact #7.)

### ANALYSIS AND DISCUSSION

**A.      Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56 ( c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102;

see *High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.  "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

**B.      Standards for Interpreting Insurance Contracts**

California's substantive insurance law governs in this diversity case.  *State Farm Mut. Auto. Ins. Co. v. Khoe*, 884 F.2d 401, 405 (9th Cir. 1989).  An insurance policy is fundamentally a contract between the insurer and the insured.  *Stein v. International Ins. Co.,* 217 Cal.App.3d 609, 614 (1990).  It is subject to the same general principles of interpretation as any other contract.  *AIU Ins. Co. v. Sup.Ct. (FMC Corp.)*, 51 Cal.3d 807, 821-822 (1990).  Interpretation of clear and unambiguous provisions in a contract is a question of law for the court, allowing summary judgment/adjudication. *See United States*

1    *v. Sacramento Mun. Util. Dist.*, 652 F.2d 1341, 1344 (9th Cir. 1981).

2           Here, none of the parties contends that the relevant terms of the insurance contract are

3    ambiguous.    Defendants note that "no party herein contends that the language of the Policy is

4    ambiguous." (Doc. 155, Joint Defendant Reply p. 2.)   Plaintiff does not contend that the language of

5    its insurance policy is ambiguous.   Thus, the Court's interpretation is a question of law.

6           The court's initial focus in resolving a question of insurance coverage is always on the language

7    of the insurance policy itself: "The rules governing policy interpretation require us to look *first* to the

8    language of the contract in order to ascertain its plain meaning or the meaning a layperson would

9    ordinarily attach to it." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 18 (1995) (emphasis added); *see*

10   *also City of Hope Nat. Medical Center v. Genentech, Inc.,* 43 Cal.4th 375, 395, 75 Cal.Rptr.3d 333,

11   (2008) (Contract interpretation is solely a judicial function when "based on the words of the instrument

12   alone, when there is no conflict in the extrinsic evidence, or a determination was made based on

13   incompetent evidence".)   Absent evidence indicating the parties intended a special usage, words used

14   in an insurance policy should be interpreted in their "ordinary and popular sense." Cal.Civ.Code § 1644.

15   In determining whether a policy provision has a "plain meaning," it must be read in the context of the

16   entire policy: "The whole of a contract is to be taken together, so as to give effect to every part ... each

17   clause helping to interpret the other." Cal.Civ.Code § 1641. To put words in context in the circumstances

18   of the case, the parties may offer parol evidence showing special meanings they attached to the words

19   used in the policy or a special meaning is given to them by usage. *See Haynes v. Farmers Ins. Exch.*, 32

20   Cal.4th 1198, 1204, 13 Cal.Rptr.3d 68, 72 (2004).[5]   Terms are to be interpreted "in their 'ordinary and

21   popular sense,' unless used by the parties in a technical sense or a special meaning is given to them by

22   usage.'"   *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 647-648 (2003). Coverage clauses are

23   ─────────────────────

24        [5] In this case, plaintiff seeks to introduce numerous declarations from various witnesses as to their "intent" regarding
     the insurance policy. For instance, plaintiff seeks to introduce the testimony of Joseph Antonini as to his intent on insurance

25   coverage. Plaintiff seeks to introduce testimony of Gregory Crouse that there was no intent to provide any coverage for this
     kind of accident; and of A&A's agent/insurance broker, James Cook, that there was insurance coverage other than the auto
     liability with Century National and the excess liability coverage with General Star.  Plaintiff seeks to introduce the declaration

26   of William Butler, of Stanislaus Food, as to Stanislaus Food's intent on insurance for the contractors under the Hauling
     Agreement.   When insurance policy terms are ambiguous, extrinsic evidence is generally admissible to establish the parties'

27   intent.   *Cooper Cos. v. Transcontinental Ins. Co.*, 31 Cal.App.4th 1107, 1104, 37 Cal.Rptr.2d 508, 514 (1995).  Here,
     however, the parties do not argue that any term of the Policy is ambiguous.  The Court does not find that the declarations as

28   to the subjective intent of the declarants dispositive of the issue of coverage.

interpreted to protect the objectively reasonable expectations of the insured. *AIU Ins. Co. v. Superior Court,* 51 Cal.3d, 274 Cal.Rptr. 820 (1990).

Here, the parties do not contend that any term of the Policy is ambiguous. When terms are unambiguous, California law requires that the mutual intention of the parties is to be "inferred, if possible, solely from the written provisions of the contract." *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th at 647-648. The mutual intention of the contracting parties at the time the contract was formed governs interpretation. Cal. Civ. Code §1636. "The parties' mutual intent is to be determined, if semantically possible, *solely* from the written provisions of the contract." *AIU Ins. Co. v. Sup.Ct., FMC Corp.*, 51 Cal.3d at 822; *Waller*, 11 Cal.4th at 18 (Such intent is to be inferred, if possible, solely from the written provisions of the contract); *Haynes v. Farmers Ins. Exch.*, 32 Cal.4th 1198, 1204 (2004) (same). Therefore, the Court turns to the language used in the Policy and the Hauling Agreement.

**C.     Analysis of Hauling Agreement and Whether Automobile Coverage was Provided**

Antonini was required, pursuant to the Hauling Agreement, to name A&A Transport as an additional insured. Defendants argue that Antonini added A&A Transport as an additional insured on Antonini's automobile coverage pursuant to the Hauling Agreement.

When additional insured endorsements, by their own terms, depend on the existence of a written contract between the named insured and the additional insured, the contract is a significant circumstance in determining the objectively reasonable expectations of the additional insured. *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.,* 111 Cal.App.4th 1234, 1245, 4 Cal.Rptr.3d 416, 426 (2003) (since entity was named an additional insured because of named insured's contractual obligation to do so, ambiguity as to the scope of the additional insured status was resolved by examining what the underlying rental contract which required the named insured to have provided for the other party); Cal.Civ.Code §1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.") Since the Hauling Agreement required A&A Transport to be named as an additional insured, the starting point in the Court's analysis in the Hauling Agreement.

**1.     Insurance Requirements in the Hauling Agreement**

The parties focus on the insurance requirements in the following portion of the Hauling

9

1   Agreement in Paragraph 9:

2           "It is understood COMPANY'S tomato hauling needs are to be provided
            by two tomato haulers.  CONTRACTOR must agree to provide trailer
3           interchange insurance with the other designated hauler in a form and
            proof acceptable to COMPANY. CONTRACTOR agrees to name the
4           other designated hauler as an additional named insured on their general
            liability and motor cargo insurance policy." (Doc. 113, Hauling
5           Agreement ¶9.)

6   This language, however, must be placed in context with the entirety of Paragraph 9 of the Hauling

7   Agreement and in context <u>with the totality</u> of the Hauling Agreement.

8           The purpose of the Hauling Agreement was for Stanislaus Food to engage "a reliable hauler to

9   transport tomatoes from their place of origin to the business premises of COMPANY."  (Doc. 113,

10  Hauling Agreement, "Recitals.")   "COMPANY," in the Hauling Agreement, is Stanislaus Food.

11  CONTRACTOR is Antonini.  Stanislaus Food included several provisions in the Hauling Agreement

12  with the purpose of protecting itself in the hauling operations.   The COMPANY included a

13  comprehensive indemnity provision in the Hauling Agreement:

14          "7.  <u>Indemnity/Liability:</u> CONTRACTOR does hereby undertake and
            assume the whole and entire responsibility and liability for any and all
15          Claims as defined in subparagraph(b).

16          (a)    Indemnification/Liability: CONTRACTOR shall . . . indemnify,
            defend, and hold harmless the COMPANY from and against all CLAIMS
17          . . .
            (b)    Definition of Claims:  . . . "Claims" means any and all claims,
18          losses, costs, damage, expenses, liabilities, liens, actions, cause of action,
            and charges of any kind for:
19
              (I) Injury to any persons (including death at any time resulting from
20          that injury); and /or
              (ii) Loss of, injury or damage to , or destruction of tangible property;
21          and/or
              (iii) Other losses, costs, damages, expenses, liabilities, liens, or
22          charges in any manner sustained by COMPANY, its agents, servants, and
            employees, and arising out of contractors services being performed under
23          this Agreement; and
              (iv) Which Claim resulted from the negligent act, intentional act, or
24          failure to act on the part of the CONTRACTOR, its agents, employees,
            servants and contractors;
25            (v) Or which Claim results from the Contractor's breach, failure to
            perform,  or  other  default  of  this  Agreement.    (Doc. 113,  Hauling
26          Agreement ¶7.)

27  Thus, the Hauling Agreement provided an extensive indemnity provision to protect Stanislaus Food.

28  To protect itself further from potential liability, the COMPANY required Antonini to name COMPANY

as an additional insured in Antonini's liability insurance:

> 8. <u>Insurance:</u> At all times during the performance of such hauling and the performance of such other services for and on behalf of COMPANY . . . the CONTRACTOR does hereby agree to procure, hold and maintain in full force and effect comprehensive general liability and business automobile insurance . . . and **COMPANY . . . shall be included under such policy or policies as an additional insured.** . . . **COMPANY . . . shall be included under said umbrella policy as an additional insured** with respect to the comprehensive general, product, and automobile, and excess liability coverage specified herein and all such policies . . . All of such insurance shall be written with insurance carriers approved by COMPANY and specifically cover all of the CONTRACTORS' activities and operations including those provided as set forth in this Agreement, owned and non-owned vehicles, and such other coverage as will be necessary to fully protect the COMPANY . . .
>
> As respects vehicles, CONTRACTOR's business automobile policy shall be a comprehensive form specifically covering all vehicles and trailers owned, non-owned, hired, and all vehicles used by sub-haulers.  (Doc. 113, Hauling Agreement ¶8) (emphasis added.)

Thus, Antonini, as the CONTRACTOR, agreed to name Stanislaus Food, as the COMPANY, as "an additional insured" as to its general liability, automobile insurance and on its umbrella policy for the purpose of "fully protect[ing] the COMPANY."

In accordance with the COMPANY's desire to protect itself and its products fully in the hauling operations, the Stanislaus Food required Antonini to provide worker compensation insurance.  It also required Antonini to name the other hauler as an additional insured on certain policies.  Paragraph 9 which states in full:

> "9. <u>Worker's Compensation/Trailer Interchange Insurance.</u> At all times during the performance of such hauling and th performance of such other services for and on behalf of COMPANY, the CONTRACTOR does hereby agree to procure, hold and maintain in full force and effect worker's compensation insurance covering and protecting the employees and servants of CONTRACTOR . . . CONTRACTOR further does hereby promise and agree to provide to COMPANY written proof of such coverage at the same time as proof of other insurance coverage is provided.
>
> "It is understood COMPANY'S tomato hauling needs are to be provided by two tomato haulers. **CONTRACTOR must agree to provide <u>trailer interchange</u> insurance with the other designated hauler in a form and proof acceptable to COMPANY. CONTRACTOR agrees to name the other designated hauler as an additional named insured on their <u>general liability</u> and <u>motor cargo insurance</u> policy.**" (Hauling Agreement, ¶9) (emphasis added).

11

The above highlighted language in Paragraph 9 of the Hauling Agreement is the sole language which requires some kind of insurance coverage for the "other designated hauler." Paragraph 9 of the Hauling Agreement explicitly identifies the types of insurance for the "other designated hauler:" trailer interchange insurance, general liability and motor cargo insurance. The Hauling Agreement does not identify any other kind of insurance coverage required by Antonini for the "other designated hauler."

On the other hand, the Hauling Agreement requires Antonini to name Stanislaus Food as an additional insured for comprehensive general liability, business automobile insurance and in an umbrella policy. (Doc. 113, Hauling Agreement, ¶8 ("CONTRACTOR does hereby agree to procure . . comprehensive general liability and business automobile insurance . . . and COMPANY . . . shall be included . . . as an additional insured.") This is consistent with the intent of "fully" protecting Stanislaus Food and is consistent with the broad scope of the "indemnity"provision in the Hauling Agreement.

To accomplish the intent of naming additional insureds on Antonini's Policy, the Blanket Additional Insured Endorsement was issued by Carolina Casualty. The Blanket Additional Insured Endorsement provides coverage for "additional insured":

> "This endorsement modifies insurance provided under the following:
> COMMERCIAL AUTOMOBILE COVERAGE
> COMMERCIAL GENERAL LIABILITY
> BASIC CARGO COVERAGE
> CARGO LIABILITY COVERAGE" (Doc. 109, Policy, Bates 100008.)

> A.   WHO IS AN INSURED (Section II - Liability Coverage) is amended to include as an insured any person or organization (called additional insured) with respect to the operation, maintenance, or use of a covered "auto" whom you are required to add as an additional insured on the policy under a written contract or agreement evidenced by certificate of insurance on file with "us" . . . (Doc. 109, Policy Bates 100008.)

The Blanket Additional Insured Endorsement alters "WHO IS AN INSURED" according the what is required "under a written contract or agreement." The Hauling Agreement required the "COMPANY" to be an additional insured for Antonini's Commercial Automobile coverage and for its Commercial General Liability coverage. The Hauling Agreement required the "other designate hauler," A&A Transport, to be named an additional insured for Antonini's Commercial General Liability, Basic Cargo liability, and trailer interchange coverage. Accordingly, the Blanket Additional Insured Endorsement modified who is an additional insured only for those coverages required by the Hauling

Agreement.  The plain language of the Hauling Agreement required A&A Transport to be named as an additional insured for  General Liability, Basic Cargo liability, and trailer interchange coverage, only. The Hauling Agreement did not require Antonini to name A&A Transport as an additional insured for the Commercial Automobile coverage.  Therefore, A &A Transport is not an additional insured for the Commercial Automobile coverage because the Hauling Agreement did not so require it.

Thus, the Blanket Additional Insured Endorsement governs Additional Insured status by reference to what is required in the Antonini's written contract. The Hauling Agreement provides that Antonini agrees to provide **trailer interchange** insurance and name A&A as an additional named insured on the **general liability and motor cargo** insurance only.  Therefore, the Blanket Additional Insured Endorsement does not provide coverage under Antonini's automobile coverage.

**2.      Defendants' Argument re Paragraph 8 of the Hauling Agreement**

Defendants argue that Paragraph 8 of the Hauling Agreement requires additional insured status as to Antonini's automobile coverage.  Defendants argue that Paragraph 8 of the Hauling Agreement shows that Stanislaus Food required coverage of all "vehicles" and trailers including those which were "un-owned" by Antonini and/or being used by "sub-haulers." (Doc. 135, Ortiz Defendants' Opposition, p. 8:1-5.)  Defendants argue that this contract term required automobile coverage between the haulers, Antonini and A&A Transport.

Defendants, however, read Paragraph 8 of the Hauling Agreement in isolation without the context of the remaining paragraph.  The first part of Paragraph 8 states the insurance requirements for which the Contractor, here Antonini, must provide to protect Stanislaus Foods and to protect itself.

> 8. Insurance: At all times during the performance of such hauling and the performance of such other services for and on behalf of COMPANY . . . the CONTRACTOR does hereby agree to procure, hold and maintain in full force and effect **comprehensive general liability and business automobile insurance** . . . and COMPANY . . . shall be included under such policy or policies as an additional insured . . .
>
> "As respects vehicles, CONTRACTOR's business automobile policy shall be a comprehensive form specifically covering all vehicles and trailers owned, non-owned, hired, and all vehicles used by sub-haulers, . . ." (Doc. 113, Hauling Agreement ¶8) (emphasis added.)

This highlighted language requires Antonini to obtains and "maintain in full force and effect

1  comprehensive general liability and business automobile insurance." It states what insurance Antonini,

2  as a hauler for Stanislaus Food, must maintain.  It also states what insurance Antonini must name

3  Stanislaus Food as an additional insured.  It does not provide for any insurance requirement between one

4  contractor and the other contractor.

5      The language relied upon by defendants, ("As respects vehicles, CONTRACTOR's business

6  automobile policy shall be a comprehensive form specifically covering all vehicles and trailers owned,

7  non-owned, hired, and all vehicles used by sub-haulers,") pertains to obligations between Antonini and

8  Stanislaus.[6] In fact, the entirety of Paragraph 8 deals with insurance obligations between Antonini and

9  Stanislaus. Thus, the insurance obligations discussed in paragraph 8 are **between** the CONTRACTOR,

10 **Antonini**, and the COMPANY, **Stanislaus Food**.  Paragraph 8 makes no mention of the "other

11 designated hauler" and simply does not apply to A&A Transport.

12      **3.    Use of the Language "Policy" v. "Coverage"**

13      Defendants argue that the use of the term "policy" and not the term "coverage" in Paragraph 9

14 of the Hauling Agreement is significant.  (Doc. 124, Defendants Motion, McLaughlin Decl. ¶22; Doc.

15 135, Ortiz Defendant's Opposition p. 12.)

16          "CONTRACTOR agrees to name the other designated hauler as an
           additional named insured on their general liability and motor cargo
17          insurance **policy**." (Emphasis added.)

18 Defendants argue the terms "policy" and "coverage" are "terms of art" in the insurance industry.  The

19 term "policy" is afforded a much broader interpretation than "coverage."  Defendants argue that under

20 industry standards, an indication that someone is an "additional insured" under the "policy" conveys that

21 the person is presumptively covered under all available "coverages" unless expressly stated otherwise.

22 (Doc. 124, Defendants Motion, McLaughlin Decl. ¶22.)

23      Defendants do not offer evidence to support their position the Hauling Agreement conformed

24 to industry standards.  Defendants have the burden of proving coverage.  *Royal Globe Ins. Co. v.*

25 *Whitaker*, 181 Cal.App.3d 532, 537, 226 Cal.Rptr. 435 (1986) (It is the insured's burden to prove that

26

27          [6] There is no evidence that A&A Transport was a sub-hauler for Antonini.  Indeed, the parties agree that Antonini
    and A&A Transport are independent entities, each with their separate Hauling Agreements with Stanislaus Food.  (See Doc.
28 113, Antonini Hauling Agreement and Doc. 115, A&A Transport Hauling Agreement.)

a claim comes within the basic coverage of the policy.)  There is no evidence that the Hauling

Agreement was drafted by any person in the insurance industry or with any intent to comply with

insurance industry standards.  The Hauling Agreement is not an insurance contract.  It is a rather simply

stated document.  From the Court's reading of the Hauling Agreement, it appears to have been drafted

to accomplish Stanislaus Food's basic hauling needs, with some legal terminology included.[7]

Regardless, the Court need not speculate.  There is no evidence that the insurance industry standards

were meant to apply in the insurance terminology used in the Hauling Agreement.

Further, a plain reading of the totality of the Hauling Agreement shows that the terms "policy"

and "coverage," and at times, "insurance" are used interchangeably.   For instance, Paragraph

"8.Insurance", requires the contractor to provide business automobile liability insurance, which is

referred to both as "coverage" and as a "policy:"

> *Compare*:   ". . . each accident under the business automobile liability **coverages**"

> *With:* "Contractor's business automobile **policy** shall be a comprehensive form . . ."

(Doc. 109, Hauling Agreement ¶8, 1st full paragraph with 2nd paragraph).  Thus, the Hauling Agreement

refers to both "coverage" and "policy" when referring to "business automobile" insurance.  Further, other

language demonstrates that the Hauling Agreement does not differentiate between the terms "policy"

and "coverage:"

> " . . .COMPANY . . . shall be included under said umbrella **policy** as an
> additional insured with respect to the comprehensive general, product,
> and automobile, and excess liability **coverage** specific herein and all such
> **policies** shall provide a waiver . . ." (Doc. 113, Hauling Agreement ¶8.)

The use of the words "coverage" and "policies" are used interchangeably.  In other language, the Hauling

Agreement refers to insurance as, just "insurance:"

> • ". . .maintain in full force and effect comprehensive general
> liability and business automobile insurance" (Doc. 113, Hauling
> Agreement ¶8, 1st sentence.)

---

[7] For instance, the Hauling Agreement contains standard "legal" paragraphs such as "Entire Agreement," "Venue/Jurisdiction," "Failure to Perform."  The evidence shows that Paragraph 9 of the Hauling Agreement was drafted by William Butler, Executive Vice President of Stanislaus, and his lawyers (Doc. 159, p. 17, Butler Decl. ¶3.)  The Court, however, does not rely upon this evidence, but relies upon the lack of evidence as to the standards upon which the Hauling Agreement was drafted.

1          •     " . . . maintain in full force and effect worker's compensation insurance . . ."(Doc.
2                   113, Hauling Agreement ¶9.)

3    The language of Hauling Agreement uses the terms "policy," "coverage" and "insurance" almost

4    interchangeably.  "The whole of a contract is to be taken together, so as to give effect to every part, if

5    reasonably practicable, each clause helping to interpret the other."  Cal.Civ.Code §1641.  Defendants

6    do not present evidence that the Hauling Agreement was drafted according to insurance industry

7    standards such that these interchanged words have unique and precise meanings.   "The words of a

8    contract are to be understood in their ordinary and popular sense, rather than according to their strict

9    legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to

10   them by usage, in which case the latter must be followed." Civ.Code §1644.

11         **4.**     **"Any Auto"**

12         Defendants argue that the Blanket Additional Insured Endorsement amends the Policy to cover

13   the additional insured "with respect to the operation, maintenance, or use of a covered 'auto' whom you

14   are required to add as an additional insured on the policy."  Defendants argue that the Blanket Additional

15   Insured Endorsement provides coverage for any "auto" which Antonini was required to add as an

16   "additional insured."

17       A.     WHO IS AN INSURED (Section II - Liability Coverage) is amended to include
              as an insured any person or organization (called additional insured) with respect
18                 to the operation, maintenance, or use of **a covered "auto" whom you are**
              **required to add as an additional insured on the policy under a written**
19                 **contract** or agreement evidenced by certificate of insurance on file with "us" .
              . . (Doc. 109, Policy Bates 100008) (emphasis added.)
20

21   Defendants argue the Policy definition of "auto" covers the tractor-trailer combination because an "auto"

22   is "a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads."  (Doc. 109, Policy

23   Bates 100048).  The term "auto' is defined broadly to include "all autos," which defendant argues

24   includes "all autos" of any "additional insured."  Defendants argue that including the tractor trailer

25   combination in "any auto" is consistent with the Policy. [8]

26   _____

27         [8]  Defendants argue that Antonini, through its broker Mr. Seitz, negotiated for the inclusion of "any autos" in the
Policy.  Defendants argue that the coverage was provided to "covered autos" which was defined by the Policy as "any auto."
28   See e.g., Doc. 135, Ortiz Opposition p. 10.)  The parties refer to this as the "Symbol 41" designation, which means that "any

                                                16

1        However, the plain language of the Blanket Additional Insured Endorsement is not as broad as

2 defendants propose.  The Blanket Additional Insured Endorsement must be read in conjunction with the

3 Hauling Agreement.  As explained above, the Hauling Agreement required Antonini to add Stanislaus

4 Foods, not A&A Transport, as an additional insured on the automobile liability coverage.  (Doc. 113,

5 Hauling Agreement ¶8 ("under the business automobile liability coverages, and COMPANY. . . shall

6 be included under such policy or policies as an additional insured").)  The Hauling Agreement does not

7 require Antonini to add A&A Transport "any autos" to an automobile policy.  The Hauling Agreement

8 required comprehensive automobile coverage for covering all of Antonini's "vehicles and trailers owned,

9 non-owned, hired, and all vehicles used by subhaulers."  (Doc. 113, Hauling Agreement ¶8.)

10        Defendants have the burden of proving coverage under the automobile liability.  *Royal Globe*

11 *Ins. Co. v. Whitaker*, 181 Cal.App.3d 532, 537, 226 Cal.Rptr. 435 (1986) (It is the insured's burden to

12 prove that a claim comes within the basic coverage of the policy.)  The Blanket Additional Insured

13 Endorsement does not provide coverage because the Hauling Agreement does not require "autos" of

14 A&A Transport to be added to the Policy.

15      **5.**      **Certificate of Insurance**

16        Defendants argue that the Certificate of Insurance demonstrate that there was coverage for

17 automobile liability.  Defendants argue that Certificate of Insurance demonstrates an "intent" to include

18 automobile liability coverage to the other hauler as an additional insured.  (Doc. 131, Opposition p. 6.)

19 Defendants argue that since the "box" on the Certificate next to "automobile liability" is checked, the

20 Certificate of Insurance "certifies" the nature and extent of coverage afforded to the identified additional

21 insured.  Defendants' argument is not so much that the Certificate is binding as to the coverage listed

---

auto" is covered by the Policy.  (See Doc. 109, Policy, Bates 100038, "Symbol 41" "description of covered auto designation symbols as 'any auto.'")  Defendants argue that the term "any autos" is unambiguous and covered the tractor trailer used by A&A Transport because A&A Transport is an additional insured.  (See Doc. 155, Joint defendants' Reply, p. 3-4.)  Again, the Blanket Additional Insured Endorsement and the Hauling Agreement must be read together.  The Hauling Agreement required Antonini to add Stanislaus Foods, not A&A Transport, as an additional insured on the automobile liability coverage. Further, the "Symbol 41" is consistent with the scope of the insurance required under the Hauling Agreement for Antonini to provide for itself: "CONTRACTOR's business automobile policy shall be a comprehensive form specifically covering all vehicles and trailers owned, non-owned, hired, and all vehicles used by sub-haulers."  Defendants offer evidence from Mr. Seitz that the "Symbol 41" to cover "any auto" was specifically negotiated for by Mr. Seitz.  His testimony, however, is not inconsistent with the purpose and intent of the Hauling Agreement of fully protecting Antonini and Stanislaus Food.  His testimony does not state that he negotiated for "Symbol 41" coverage for <u>A&A Transport.</u>  (See Doc. 120, Seitz Depo. p. 44-47.)

1  on the Certificate.  Defendants' argument is that the Certificate shows the parties intent as to the types

2  of coverage that should have been provided.[9]

3          Plaintiff argues the Certificate of Insurance is not a contract between the insurer and the

4  certificate holder.  The language of the Certificate notes that it does not alter, amend or extend the terms

5  of the Policy.  The language of the Certificate notes that it is for information only.

6          "A certificate of insurance is merely evidence that a policy has been issued. It is not a contract

7  between the insurer and the certificate holder. [Citations.]" *Empire Fire & Marine Ins. Co. v. Bell*, 55

8  Cal.App.4th 1410, 1423, fn. 25, 64 Cal.Rptr.2d 749 (1997); *see* Ins.Code § 384.  Here, the  certificate

9  states that it "does not amend, extend or alter" the coverage provided by the policy.  The language at the

10  top of the Certificate of Insurance states:

11              THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION
             ONLY  AND  CONFERS  NO  RIGHTS  UPON  THE  CERTIFICATE
12              HOLDER.   THIS CERTIFICATE **DOES NOT AMEND, EXTEND,
             OR ALTER THE COVERAGES** AFFORDED BY THE POLICIES
13              BELOW."  (Doc. 114, Certificate of Insurance) (emphasis added.)

14  The terms of the insurance policy prevail over any conflicting terms stated in the certificate.  *Pardee*

15  *Construction Co. v. Insurance Co. of the West*, 77 Cal.App.4th 1340, 1347, 92 Cal.Rptr.2d 443, fn. 2

16  (2000) ("A certificate of insurance is merely evidence that a policy has been issued.") Therefore, the

17  Certificate of Insurance does not alter the coverage.

18          Absent the Hauling Agreement, the Certificate of Insurance may provide some evidence of an

19  intent to provide the insurance coverage noted on the Certificate.  However, here, the Hauling

20  Agreement states in plain terms the types of insurance Antonini was to provide A&A Transport as an

21  Additional Insured.  Accordingly, the Court finds the plain terms of the automobile coverage of the

22  Policy does not provide coverage to A&A Transport.

23  _____

24          [9] For instance, as further evidence of intent, defendants argue a "course of conduct."  A Certificate of Insurance was
   issued in 2006, a year after the accident.  The Certificate of Insurance refers to the same "Blanket Additional Insured
25  Endorsement" as is the subject of this litigation, and again certifies that A&A as an additional insured under Antonini's
   Carolina Casualty policy (although for a new policy) for "Automobile Liability."  (Doc. 131, Diego Opposition p.6; Doc. 118,
26  Exh. H "Certificate of Insurance.")  The Court declines to speculate on whether this Certificate establishes any course of
   conduct or any specific intent.  The 2006 Certificate of Insurance is not in a different form as the Certificate of Insurance at
27  issue and thus, could be entirely consistent with the intent not to provide coverage for automobile liability.  It is undisputed
   that A&A Transport did not tender the defense until June, 2007, long after the accident and after the 2006 Certificate of
28  Insurance.  Thus, the Court finds that the 2006 Certificate of Insurance is not a relevant "course of conduct" because it
   predates any notice to Carolina Casualty that anyone expected "automobile liability" insurance.

**D.      General Liability Coverage Applicable to Auto Accidents**

      **1.      Defendants' Arguments**

Defendants argue that the Blanket Additional Insured Endorsement makes the General Liability Coverage applicable to auto accidents. (Doc. 135, Ortiz Opposition p.11.) Defendants argue the express terms of the Blanket Additional Insured Endorsement made the Commercial General Liability Coverage explicitly applicable to auto accidents. Defendants highlight the following language from the Blanket Additional Insured Endorsement:

> A.      WHO IS AN INSURED (Section II - Liability Coverage) is amended to include as an insured any person or organization (called additional insured) **with respect to the operation, maintenance, or use of a covered "auto"** whom you are required to add as an additional insured on the policy under a written contract or agreement evidenced by certificate of insurance on file with "us" . . . (Doc. 109, Policy Bates 100008) (emphasis added)

Defendants argue that the highlighted language modified the coverage provided under the Commercial General Liability provision of the Policy to include coverage for the operation, maintenance, or use of any covered "auto."

      **2.      Plaintiff's Argument**

Plaintiff argues the Blanket Additional Insured Endorsement does not change the Policy Exclusions. The General Liability contains an auto exclusion which applies to the case. (Doc. 160, Plaintiff's Reply, p. 6-7.) The Auto Exclusion under the Commercial General Liability precludes coverage for the injuries arising out of the accident. The Auto Exclusion to the Commercial General Liability Coverage Form precludes coverage for any "'[b]odily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others' of any 'auto.'" (Doc. 109, Policy, Bates 100074.) The Auto Exclusion excludes any bodily injuries, including death, arising out of the ownership, maintenance, use or entrustment to other of a truck.

      **3.      The Blanket Additional Insured Endorsement does not Amend Coverage in the General Liability Policy**

It is undisputed that Antonini's Commercial General Liability Coverage includes A&A Transport as an Additional Insured, pursuant to the Blanket Additional Insured Endorsement. Neither party has argued otherwise. Indeed, as shown, *infra*, the Hauling Agreement required Antonini to name A&A

19

1    Transport as an additional insured on its "general liability" policy.

2        Here, plaintiff argues that the accident was excluded from coverage. The burden is on the

3    insured to prove the claim is within the basic scope of coverage, whereas the insurer bears the burden

4    of proof on exclusions. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th at 16, 44 Cal.Rptr.2d at 376.

5    Policy exclusions are strictly construed. *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 648, 3

6    Cal.Rptr.3d 228, 73 P.3d 1205 (2003).

7        The Commercial General Liability Coverage is organized in the following Sections (Doc. 109,

8    Policy, Bates 100071-100078, 100104-100111; See Doc. 127, parties' stipulation of pages):

9                Section I - - COVERAGES (Bates 100071)

10               Section II - - WHO IS AN INSURED (Bates 100104)

11               Section III - - LIMITS OF INSURANCE (Bates 100105)

12               Section IV - - COMMERCIAL GENERAL LIABILITY CONDITIONS (Bates 100105)

13               Section V - - DEFINITIONS (Bates 100107).

14

15       The Blanket Additional Insured Endorsement amends only Section II, who is the insured. The

16   plain language of the Blanket Additional Insured Endorsement amends "Section II - - WHO IS AN

17   INSURED:"

18       A.    WHO IS AN INSURED (Section II - Liability Coverage) is amended to include as an
              insured any person or organization (called additional insured) with respect to the
19            operation, maintenance, or use of a covered "auto" whom you are required to add as an
              additional insured on the policy under a written contract or agreement evidenced by
20            certificate of insurance on file with "us" . . . (Doc. 109, Policy Bates 10008) (Emphasis
              added.)
21

22   Section II of the Commercial General Liability identifies who is the "insured."

23       Defendants argue that the Blanket Additional Insured Endorsement amended the entirety of the

24   Commercial General Liability Coverage. However, the plain language of the Blanket Additional Insured

25   Endorsement amended only the "Section II." No other Section was amended. "Section I - -

26   COVERAGES" was not amended. The Blanket Additional Insured Endorsement is consistent with the

27   Hauling Agreement that Antonini would amend the "additional insured" in the Policy because the

28   Hauling Agreement required Antonini to add the "additional insured" status.

The significance of this finding is that the Blanket Additional Insured Endorsement does not change any of the coverage or exclusions in the "Section I--COVERAGES." "Section I--COVERAGES" contains the following subsections and is organized as follows, in relevant part:

Section I- -COVERAGES (Bates 100071)
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

    1.    Insuring Agreement (Bates 100071)
        a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .  (Doc. 109, Policy, Bates 100071.)

"SECTION I- -COVERAGES" also contains the exclusions to the Insuring Agreement.  In pertinent part, the exclusions exclude insurance for "autos" as follows:

Section I- -COVERAGES (Bates 100071)
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

    1.    Insuring Agreement (Bates 100071)
    **2.**    **Exclusions**
        This insurance does not apply to:
        . . .
        **g.**    **Aircraft, Auto Or Watercraft**
            "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented loaned to any insured. . . . (Doc. 109, Policy, Bates 100074.)

The language in the "**Aircraft, Auto Or Watercraft**" exclusion excludes bodily injury arising from the ownership, maintenance, use or entrustment to others of any "auto." An "auto" is a land motor vehicle, trailer or semitrailer.  (Doc. 109, Policy, Bates 100048 (auto definition).)  The exclusion precludes coverage for injury arising from the use of an auto.

Defendants argue that while there is an auto exclusion, the Commercial General Liability covers was made applicable to auto accidents by the express terms of the Blanket Additional Insured endorsement made:

    A.    WHO IS AN INSURED (Section II - Liability Coverage) is amended to include as an insured any person or organization (called additional insured) **with respect to the operation, maintenance, or use of a covered "auto"** whom you are required to add as an additional insured   (See Doc. 131, Diego Opposition p. 8.)

21

As noted, infra, the Blanket Additional Insured Endorsement only modifies who is insured.  It is does not modify, change or alter the exclusions.  The auto exclusion still exists and applies, notwithstanding who gets added as an additional insured.  Further, the auto exclusion and "who is an insured" under the Policy are not in conflict.  The Blanket Additional Insured Endorsement only modifies "who is the insured."  It simply does not address, modify or change any exclusion.  Accordingly, the General Liability Coverage is not applicable to automobile accidents.

**E.      Cargo and Trailer Interchange do not Cover the Accident**

The defendants do not contend that the Cargo coverage and the Trailer Interchange coverage provide insurance coverage for the accident.  "The Diego Defendants do not contest the fact that Cargo and Trailer Interchange is not applicable to their wrongful death claim for damages."  (Doc. 131, Diego Opposition p. 7:15-16.) The Ortiz Defendants do not argue that the Cargo coverage and the Trailer Interchange coverage provide insurance coverage for the accident.  (See Doc. 135, Ortiz Opposition; Doc. 104, Joint Defendant Moving Papers.)

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

1

**CONCLUSION**

2          For the foregoing reasons, the Court GRANTS plaintiff Carolina Casualty's motion for

3    summary adjudication on the issue of insurance coverage and DENIES Defendants' motion for

4    summary judgment.  The Court finds that coverage was not afforded under Carolina Casualty

5    Insurance Company's policy numbered CTP 3398 30 to A&A Transport as an additional insured for

6    the claims and action against A&A Transport and its employee Jose Pimental Rodriguez for the

7    injuries and damages arising out of the accident on August 10, 2005.

8          In light of the ruling, counsel are to meet and confer on the status of the remaining counts and

9    claims, and within 25 days file status declarations as to the remainder of the action.

10   IT IS SO ORDERED.

11   **Dated:    January 4, 2010                          /s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28